## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RACHAEL WEBSTER, LAUREN PORSCH, HOLLY LEDERER, SARA GATES, DONNA NEWMAN, CHRISTINE PROKOP, LORRAINE SNODGRASS, ALISON WHITEHEAD, MELISSA HILL, MAUREEN MCGUINNESS, and AMANDA CLOSE, individually and on behalf of all others similarly situated, | Case No. 17-cv-225-DSC |
| Plaintiffs, | |
| v. | |
| LLR, INC., d/b/a LuLaRoe | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

i

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS ................................ 2

        A.      Defendant LuLaRoe .................................................................................. 2

        B.      LuLaRoe's Tax Practices Prior to April 2016 ................................................. 2

        C.      LuLaRoe Discovers it's Overpaying Tax ....................................................... 3

        D.      LuLaRoe's Implementation of the 2016 Tax Policy ........................................ 3

        E.      LuLaRoe Lies to its Retailers Regarding the 2016 Tax Policy ...................... 5

        F.      LuLaRoe Admits Knowing that its Tax Procedures were Unlawful
                (and the White Paper, False) Yet Continued its Practices ............................. 6

        G.      The Plaintiffs' and Class Members' Experiences .......................................... 7

        H.      LuLaRoe's Improper Attempt to "Pick Off" the Plaintiffs and
                Putative Class Members............................................................................ 10

        I.      LuLaRoe Benefited From the Use of Audrey and the 2016 Tax Policy........ 13

III.    PROPOSED CLASSES .................................................................................. 14

IV.     ARGUMENT ................................................................................................. 16

        A.      Rule 23(a) Prerequisites are Established.................................................... 16

                1.      Numerosity.................................................................................. 16

                2.      Commonality of Issues ................................................................ 17

                3.      Typicality of Claims .................................................................... 19

                4.      Plaintiffs and Counsel Can Adequately Represent The Interests
                        Of The Classes .......................................................................... 19

        B.      Rule 23(b)(3) Prerequisites are Established................................................ 21

                1.      Predominance............................................................................. 21

i

a.    State law variations in Classes ............................................... 22

b.    Plaintiffs' consumer protection claims satisfy the
predominance inquiry ............................................ 23

c.    Plaintiffs' conversion claims satisfy the
predominance inquiry ............................................ 31

d.    Plaintiffs' contract-based claims satisfy the
predominance inquiry ............................................ 32

e.    Damages can be determined on a class-wide basis ............... 35

2.    Superiority ........................................................................... 37

3.    Manageability .................................................................. 38

C.    Rule 23(g) Appointment of Class Counsel is Warranted .............................. 39

V.    CONCLUSION ........................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Page(s)**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ......................................................25

*Allen v. Holiday Univ.,*
    249 F.R.D. 166 (E.D. Pa. 2008) ............................................................................................26

*Amchem Prod., Inc. v. Windsor,*
    521 U.S. 591 (1997) .......................................................................................................22, 24

*Basic Inc. v. Levinson,*
    485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ........................................................25

*Beatty v. Guggenheim Exploration Co.,*
    225 N.Y. 380 (1918) ...........................................................................................................34

*Carnegie v. Household Intern., Inc.,*
    376 F.3d 656 (7th Cir. 2004) ..............................................................................................38

*Dal Ponte v. American Mortg. Exp. Corp.,*
    2006 WL 2403982 (D.N.J. 2006) ......................................................................................34

*Daye v. Cmty. Fin. Serv. Centers, LLC,*
    313 F.R.D. 147 (D. N.M. 2016) ..........................................................................................25

*Ellsworth v. U.S. Bank, N.A.,*
    2014 WL 2734953 (N.D. Cal. June 13, 2014) ....................................................................34

*Falise v. Am. Tobacco Co.,*
    94 F. Supp. 2d 316 (E.D.N.Y. 2000) .................................................................................30

*Farneth v. Wal-Mart Stores, Inc.,*
    No. GD-13-011472 (Pa. Com. Pl. Ct. March 21, 2017)
    (Allegheny County, Colville, J.) ....................................................................................26, 27

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .......................................................................................23, 33

*Heinzl v. Cracker Barrel Old Country Stores, Inc.,*
    No. 14-cv-1455, 2016 WL 2347367 (W.D. Pa. Jan. 27, 2016),
    *report and recommendation adopted,* No. 14-cv-1455,
    2016 WL 1761963 (W.D. Pa. Apr. 29, 2016), *Fed. R. Civ. P. 23(f)*
    *appeal denied,* No. 16-8042 (3d Cir. Aug. 12, 2016) ........................................................17

*In re Abbott Laboratories Norvir Anti-Tr. Litig.*,
    2007 WL 1689899 (N.D. Cal. June 11, 2007) .................................................33

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 630 (S.D. Fla. 2015) .........................................................21, 22, 24

*In re Community Bank of N. Virginia Mortg. Lending Practices Litig. ("CBNV I")*,
    418 F.3d 277 (3d Cir. 2005) .........................................................................22

*In re Community Bank of N. Virginia Mortg. Lending Practices Litig.* ("CBNV III"),
    795 F.3d 380 (3d Cir. 2015) .........................................16, 17, 21, 22, 37, 38

*In re Flonase Antitrust Litig.*
    284 F.R.D. 207 (E.D. Pa. 2012) ..................................................................33

*In re Modafinil Antitrust Litig.*,
    837 F.2d 238 (3d Cir. 2016) .........................................................................16

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    319 F.R.D. 158 (E.D. Pa. 2016), *reconsideration denied*, No. 06-0620,
    2017 WL 696983 (E.D. Pa. Feb. 22, 2017) ...............................................22, 35

*In re Natn'l Australia Bank Securities Litg.*,
    No. 03 Civ. 6537, 2006 WL 3844463 (S.D. N.Y. Nov. 8, 2006) ....................20

*In re Natl. Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016), cert. denied sub nom.,
    *Armstrong v. Natl. Football League*, 137 S. Ct. 607 (2016) .......................19, 20

*In re Plastics Additives Antitrust Litig.*,
    No. 03-cv-2038, 2006 WL 6172035 (E.D. Pa. Aug. 31, 2006) .......................38

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*
    148 F.3d 283 (3d Cir. 1998) .........................................................23, 25, 26

*In re Sch. Asbestos Litig.*,
    789 F.2d 996 (3d Cir.1986) ..........................................................................33

*In re U.S. Foodserv. Pricing Litig.*,
    729 F.3d 108 (2d. Cir. 2013) ...........................................................24, 26, 29, 31

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ..........................................................................38

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ...................................................................22, 36

iv

*In re Wellbutrin XL Antitrust Litg.*,
    282 F.R.D. 126 (E.D. Pa. 2011).................................................................................20

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004), *abrogated in part on other grounds*
    *by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).......................29

*Koreag, Controle Et Revision S.A. v. Refco F/X Assoc., Inc.*
    961 F.2d 341 (2d Cir.1992)....................................................................................34

*Lake v. First Nationwide Bank*,
    156 F.R.D. 615 (E.D. Pa. 1994).............................................................................37

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    Nos. 3:13-cv-1470 and 1471, 2017 WL 985640 (D. Conn. Mar. 13, 2017)...............19, 23

*Meyer v. CUNA Mut. Group*,
    CIV.A. 03-602, 2006 WL 197122 (W.D. Pa. Jan. 25, 2006)..............................38

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir.2002).................................................................................25

*Mullins v. Direct Digital, LLC*,
    No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014.)..................17, 36

*O'Brien v. Brain Research Labs, Inc.*,
    2012 WL 3242365 (D.N.J. Aug. 8, 2012) ..........................................................33

*Petrello v. White*,
    412 F. Supp. 2d 215 (E.D.N.Y. 2006), *aff'd*,
    344 Fed. Appx. 651 (2d Cir. 2009).......................................................................34

*Reyes v. Netdeposit, LLC*,
    802 F.3d 469 (3d Cir. 2015)...................................................................22, 24, 26

*Robidoux v. Celani*,
    987 F.2d 931 (2d. Cir. 1993).................................................................................19

*Salvagne v. Fairfield Ford, Inc.*,
    264 F.R.D. 321 (S.D. Ohio 2009).........................................................................24

*Sec. Pacific Mortg. & Real Estate Services, Inc. v. Republic of Philippines*,
    962 F.2d 204 (2d Cir.1992)...................................................................................34

*Shankroff v. Advest, Inc.*,
    112 F.R.D. 190 (S.D. N.Y. 1986) .........................................................................20

*Spencer v. Hartford Fin. Servs. Grp., Inc.,*
    256 F.R.D. 284 (D.Conn.2009)....................................................................25

*Stoneridge Inv. Partners, LLC v. Scientific–Atlanta,*
    552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)....................................25

*Strawn v. Farmers Ins. Co. of Oregon,*
    258 P.3d 1199 (Or. 2011), *adhered to on reconsideration,*
    256 P.3d 100 (Or. 2011) ...........................................................................26

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011).................................................................22, 35

*Toth v. Nw. Sav. Bank,*
    No. GD-12-008014, 2013 WL 8538695 (Pa. Com. Pl. Ct. Mar. 1, 2013)
     (Allegheny County, Wettick, J.) .........................................................27, 31

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016).......................................................................21, 22

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)...............................................................................19

*Zeno v. Ford Motor Co., Inc.,*
    238 F.R.D. 173 (W.D. Pa. 2006) ...............................................................38

## Statutes, Regulations, and other Authorities     Page(s)

Fed. R. Civ. P. 23.....................................................................................29, 40

Fed R. Civ. P. 23(a) ...................................................................16, 17, 19, 20, 21

Fed. R. Civ. P. 23(a)(1) ..................................................................................16

Fed. R. Civ. P. 23(a)(2).................................................................................17

Fed. R. Civ. P. 23(a)(3).................................................................................19

Fed. R. Civ. P. 23(a)(4).................................................................................19

Rule 23(b) .................................................................................................21

Fed. R. Civ. P. 23(b)(3)..............................................................14, 16, 21, 22, 37, 38

Fed. R. Civ. P. 23(b)(3) Advisory Committee Notes..............................................30

Fed. R. Civ. P. 23 (b)(3)(A)-(D) .....................................................................37

Fed. R. Civ. P. 23(g).................................................................................39, 40

Fed. R. Civ. P. 23(g)(1)............................................................................................................39

Restatement (First) of Restitution § 1 .......................................................................................33

Plaintiffs Rachael Webster, Lauren Porsch, Holly Lederer, Sara Gates, Donna Newman, Christine Prokop, Lorraine Snodgrass, Alison Whitehead, Melissa Hill, Maureen McGuinness, and Amanda Close ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, submit this Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, stating as follows:

## I.      INTRODUCTION

Defendant, LLR, Inc. d/b/a LuLaRoe ("LuLaRoe"), implemented and used a point-of-sale ("POS") system to charge a "tax" to consumers in certain states when no such tax was due on their purchases of clothing.  LuLaRoe knew its "tax" collection in these states was unlawful and actively misled consumers about the legality of this practice.  LuLaRoe's fraudulent scheme converted more than $8.3 million from class members between April 2016 and June 1, 2017, and spanned over 2 million individual transactions, harming Plaintiffs and class members in precisely the same manner.

Plaintiffs reside in eleven (11) different states where clothing sales are not taxable. Each Plaintiff asserts putative class claims on behalf of herself and similarly situated consumers in her state, based on the following causes of action: (1) breach of constructive trust; (2) unjust enrichment; (3) applicable consumer protection laws; and (4) conversion and misappropriation. Plaintiffs seek the following relief:  (1) actual damages in the form of a complete and accurate disgorgement of all unlawfully collected taxes; (2) an accounting to ensure that the disgorgement is in fact complete and accurate; and (3) all available statutory damages, punitive damages, attorney fees, and costs.

## II.   COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS

### A.   Defendant LuLaRoe

LuLaRoe is a multi-level marketing company that sells various clothing items to consumers through over 75,000 independent contractors located in all 50 states.  LuLaRoe is currently worth approximately $2 billion[1] and, as of March 2017, had $450 million of net assets over liabilities. (*See* Exh. A,[2] at LLR485:14-20).  Its business model provides that LuLaRoe sell its products wholesale to its Independent Fashion Retailers ("retailers" or "consultants"), who, in turn, sell those products at retail to LuLaRoe's end consumers.  (*See* Exh. B, at 35:20-36:2).

### B.  LuLaRoe's Tax Practices Prior to April 2016

Beginning in 2014, LuLaRoe came under pressure from authorities to remit tax on its retailers' sales.  (*See* Exh. A, at LLR365:21-366:1; Exh. C, at ¶ 5; Exh. B, at 66:11-68:4).  As a result, LuLaRoe initiated a relationship with Utah-based POS vendor ControlPad to implement a POS system called "Audrey."[3]  (*See id.*).  LuLaRoe introduced Audrey to retailers in or around May or June 2015.  (*See* Exh. B, at 46:6-9). According to LuLaRoe's Chief Executive Officer, Mark Stidham, ControlPad agreed to design Audrey to calculate tax based on a transaction's "ship to" address (*i.e.*, the address of the end consumer—not the address of the LuLaRoe retailer responsible for the sale).[4]  (*See id.* at 45:22-46:5).

---

[1]    Forbes, This Retailer Went from Zero to $2 Billion in Four Years, October 19, 2017, available at: https://www.forbes.com/sites/richardkestenbaum/2017/10/19/this-retailer-went-from-zero-to-2-billion-in-four-years/#3fc8bd025fa3 (last accessed Dec. 6, 2017).

[2]    All Exhibit references herein are references to the Exhibits attached to Plaintiffs' Motion for Class Certification.

[3]    At all times relevant, LuLaRoe's policy and procedures required that LuLaRoe retailers "must" use the Audrey POS; and the retailers agree in their contract with LuLaRoe to follow the LuLaRoe policies and procedures.  (*See* Exh. B, at 61:21-62:8).

[4]    Plaintiffs do not have a copy of this agreement with ControlPad.  While Mr. Stidham confirmed that LuLaRoe provided it to its counsel (*See* Exh. B, at 75:16-76:4), LuLaRoe's counsel

Prior to April 2016, the Audrey system included a toggle-switch. LuLaRoe's retailers could use the toggle-switch to "turn off" tax on sales made into one of Plaintiffs' state taxing jurisdictions. By using the toggle-switch, retailers could prevent LuLaRoe's POS system from charging tax to the putative class members, consistent with members' tax obligations. (*See* First Amended Class Action Complaint, Doc. No. 53 at ¶ 34; *compare* LLR, Inc.'s Answer and Affirmative Defenses, Doc. No. 59 at ⁋ 34).

### C. LuLaRoe Discovers it's Overpaying Tax

In January 2016, LuLaRoe's Senior Tax Advisor undertook to reconcile LuLaRoe's prior tax filings. (*See* Exh. D, at 144:3-13). What he discovered was that, because of the way Audrey was programmed, LuLaRoe was paying tax on *all* sales regardless of whether or not LuLaRoe had actually charged tax to the end consumer (*i.e.*, LuLaRoe was overpaying tax to states because it was paying tax on the transactions shipped to class members, for whom no tax was owed). (*See* Exh. D, at 23:13-18, 144: 3-145:18). LuLaRoe manufactured a "solution" to address this tax dilemma: the 2016 Tax Policy (defined below), which was designed to shift the overpayments caused by Audrey's system failures from LuLaRoe to its own consumers.

### D. LuLaRoe's Implementation of the 2016 Tax Policy

In April 2016, LuLaRoe announced its new tax policy via webinar and conference call.[5] (*See* Exh. B, at 57:4-14; Exh. D, at 69:19-70:7, 72:3-20). LuLaRoe announced that henceforth Audrey would collect tax from end consumers based upon retailer location, across the board, on

---

has refused to provide the same to Plaintiffs' counsel, which is currently the subject of a pending Emergency Motion to Compel. (*See* Doc. No. 65).

[5]       Mr. Stidham confirmed in his recent deposition that LuLaRoe still has this webinar (*See* Exh. B, at 57:15-17) and it falls within the categories of documents that LuLaRoe agreed to produce (and Plaintiffs requested). However, LuLaRoe's counsel has not yet responded to Plaintiffs' counsel's request to supplement LuLaRoe's production with the webinar.

every transaction, regardless of where the product was delivered (the "2016 Tax Policy").  (*See* Exh. D, at 69:19-70:7; Exh. E, at LLR2926-28).

Retailers had no choice but to use Audrey and comply with the new policy, which LuLaRoe emailed to every retailer.  (*See* Exh. D, at 72:3-74:7; Exh. E, at LLR2926-28).  One retailer summarized LuLaRoe's mandate as follows:

> Sales Tax - LEAVE THE BOX CHECKED FOR SALES TAX IN ALL CIRCUMSTANCES FROM NOW ON - it will be calculated based on where you live. We can either start right now and charge you as consultants sales tax on the retail amount when you place your wholesale orders (a terrible solution that no one wants) - or, you all have to collect sales tax 100% of the time regardless of where it is being shipped. The Sales Tax will be calculated based on where YOU live and do business. This is NOT optional - you MUST leave the sales tax box checked - everyone NEEDS to charge Sales Tax based on the rate of the location where THEY DO BUSINESS on all purchases no matter what. The tax rate that your customer will be charged will be based on where YOU are. Keep the box checked. This is our process now - to remain in good standing with all the states. This is short term. In the long term, the software will get a new functionality and your customer will be charged tax based on the shipping destination in the future.

(*See* Exh. F).  Thereafter, LuLaRoe altered the Audrey POS to prevent retailers from turning off the tax feature—the toggle switch—when making sales delivered into other states, such as to class members' states.  (*See* Amended Class Action Complaint, Doc. No. 53, at ¶ 36; *compare* LLR's Answer and Affirmative Defenses, Doc. No. 59, at ¶ 36; *see also* Exh. H).  LuLaRoe retailers were instructed not to change the tax rate calculated by Audrey, even for remote sales delivered to other states where clothing purchases are not taxable.  (*See* Exh. D, at 71:8-22).

As a result of LuLaRoe's new policy and the change in Audrey's functionality, LuLaRoe automatically and systematically charged every consumer tax, even if consumers were not obligated to pay such tax, whenever LuLaRoe's retailor responsible for the sale was located in a state that taxes clothing.  By way of example, if a consumer from Pennsylvania purchased a LuLaRoe product online from a consultant in a state with tax on clothes, such as Ohio, and had

that product shipped into Pennsylvania, LuLaRoe improperly charged the Pennsylvania resident an Ohio tax on that purchase.   (*See* Exh. D, at 85:12-19, 146:8-19).  If that same Pennsylvania consumer also purchased from a retailer in Washington and Hawaii, LuLaRoe charged a Washington and Hawaii tax, respectively, to the consumer.  (*See id.* at 148:11-149:4).

### E.  LuLaRoe Lies to its Retailers Regarding the 2016 Tax Policy

LuLaRoe's retailers are the front line point of communication with LuLaRoe's end consumers.[6] (*See* Exh. B, at 36:16-19; Exh. D, at 96:3-20).  After it enacted the unlawful 2016 Tax Policy, LuLaRoe issued a sales tax memorandum and "white paper" memorandum to all of its retailers, which was authored by Terrel Transtrum, a "licensed tax attorney with law degrees from University of Idaho (J.D.) and University of Miami (LL.M. – Masters of Law in Taxation)."  (*See* Exh. G; Exh. H).   In the "white paper," LuLaRoe told its retailers that its new policy, which required that tax be charged based upon the location of the retailer, was proper and legal.  (*See id.*).  The "white paper" claimed it was proper to collect tax based on retailer address, because it is as if the remote, online consumer is purchasing from a retailer's home.[7]  (*See id.*).  As repeatedly admitted by LuLaRoe's own officers, this information was false.  (*See* Section II(F), below; *see also*, *e.g.*, Exh. T, at 7:21-8:11, 32:6-11, 123:6-124:6 (LuLaRoe's "Ethics Specialist," who was part of LuLaRoe's management team, admits, "I don't think it was ethical" to collect tax from the class members when no tax should have been charged)).

---

[6]     If a consumer made a complaint to LuLaRoe, about tax or otherwise, LuLaRoe's practice was to direct the end consumer back to the LuLaRoe retailers.  (*See* Exh. D, at 95:25-96:9).

[7]     The only information provided to LuLaRoe's retailers about the 2016 Tax Policy was the announcement itself, the sales tax memorandum, and the white paper.  (*See* Exh. D, at 96:21-97:3).  Despite having retailers dedicated as "trainers" who are responsible to train other retailers, including on LuLaRoe tax practices, LuLaRoe's trainers received no additional information on LuLaRoe's 2016 Tax Policy.  (*See* Exh. B, at 33:24-34:11).

LuLaRoe's intended result is evident.  LuLaRoe expected that the false information set forth in the white paper would be disseminated to its end consumers:

> Q:    Did LuLaRoe expect that the retailers would let the customers know that sales tax was charged based upon consultant location?
>
> A:    Yes.  When we sent the white paper or the sales tax memo[randum], when we sent all that information, it was to the retailers, and it was for their being able to explain how the system worked.
>
> Q:    Okay.  So you expected that the end consumers would know that policy?
>
> A:    No.  We expected the retailers to know that to explain it to the end customers.
>
> Q:    Okay.  So you did expect the retailers to tell the end customer that?
>
> A:    Yes.

(*See* Exh. D, at 110:25-111:13).  LuLaRoe also knew and expected that, if questioned, retailers would send the sales tax memorandum to end customers.  (*See id.* at 107:23-108:4).  Indeed, LuLaRoe itself sent the sales tax memorandum to end consumers who questioned LuLaRoe about the validity of its tax policy.  (*See* Exh. I; Exh. D, at 107:10-15).

### F.  LuLaRoe Admits Knowing that its Tax Procedures were Unlawful (and the White Paper, False) Yet Continued its Practices

Within a month of LuLaRoe issuing the fraudulent advice in the sales tax memorandum and white paper to its retailers (and, therefore, its end consumers) the Attorney General of the Commonwealth of Pennsylvania transmitted a consumer complaint to LuLaRoe, dated May 16, 2016, challenging LuLaRoe's illegal tax practices.  (*See* Exh. J).  On June 28, 2016, LuLaRoe responded to the Attorney General, ***unequivocally admitting that LuLaRoe knew its 2016 Tax Policy caused people in states that did not have a sales tax on the clothing that LuLaRoe sells to be overcharged***.  (*See* Exh. K).  Despite this admission, LuLaRoe ***did not*** discontinue the improper 2016 Tax Policy or reinstitute the ability for retailers to remove tax charges on purchases sold outside of their state.

6

By May 31, 2016, LuLaRoe had also received a notice from the State of Minnesota Office of the Attorney General requesting that LuLaRoe "review and correct its systems to be in compliance with Minnesota sales tax law" and "determine the number of other Minnesotans who need to be refunded for paying sales tax." (*See* Exh. L). Yet again, LuLaRoe acknowledged its fault but did not discontinue its systematic practice of overcharging tax to class members. (*See* Exh. M).

At its 30(b)(6) deposition, LuLaRoe admitted that when it enacted its 2016 Tax Policy it was aware it would result in customers being incorrectly charged tax. (*See* Exh. D, at 92:13-93:13). LuLaRoe's CEO, Mr. Stidham, admitted under oath in an unrelated Utah proceeding brought by its former payment processing vendor that LuLaRoe knew this class action was coming. (*See* Exh. A, at LLR396:20-397:8). Despite these acknowledgements and after admitting to two different states' Attorney Generals that its tax practices were unlawful, LuLaRoe continued to unlawfully surcharge its consumers until June 1, 2017 - months after this suit was filed.[8] (*See* Exh. D, at 93:20-24, 94:10-12). LuLaRoe never retracted its statements that the 2016 Tax Policy was proper and lawful, concealing its knowledge from retailers and, by extension, its end consumers. LuLaRoe also continued to disseminate the false information in the sales tax memorandum and white paper up until the initial Complaint was filed in this action. (*See*, *e.g.*, Exh. N; Exh. I).

### G. The Plaintiffs' and Class Members' Experiences

LuLaRoe's conduct was uniform to all Plaintiffs and all class members. Plaintiffs and the class members all purchased LuLaRoe clothing from retailers outside of their state to be shipped into their state. (*See* Exh. D, at 155:7-157:5). Each Plaintiff and every class member received an

---

[8]    According to LuLaRoe, by June 1, 2017, its retailers were no longer operating on Audrey and the new POS system purportedly does not overcharge tax to the class members. (*See* Exh. D, at 94:10-12).

invoice from the retailer that was generated by LuLaRoe's Audrey system.  (*See id.*; Exh. O, at ¶ 7; Amended Class Action Complaint, Doc. No. 53, at ¶¶ 42-46).  The invoice represented that LuLaRoe collected a "tax" on the purchase.  (*See id.*).  Each Plaintiff and every class member paid the invoice that implicitly represented they were paying a proper sales/use tax when, in fact, no such tax was owed by the Plaintiffs and class members (*see id.*) – a fact readily known by LuLaRoe (*see* Section II(F), above).  If a customer questioned the tax to LuLaRoe, LuLaRoe directed the inquiry to the retailers to perpetuate the deceptive practice.  (*See* Exh. D, at 95:25-96:9).  In turn, the retailers were trained to uniformly inform the customer of the 2016 Tax Policy – set forth in the "white paper" and sales tax memorandum – wrongly claiming that LuLaRoe's deceptive practice was lawful (*i.e.*, that the tax was properly assessed based on consultant location).  (*See* Section II(E), above).

LuLaRoe has identified the transactions for which it incorrectly charged a non-existent "sales tax" to its end consumers in the class states and was able to ascertain the identity of the end consumers for those transactions.  (*See* Exh. D, at 123:7-124:25).  The harm to the class is consistent because of LuLaRoe's systematic, fraudulent conduct:

> Q:  Have you looked into the purchases of each of the named plaintiffs?
> A:  Yes.
> Q:  Do you agree that each were charged sales tax on at least one purchase?
> A:  Yes.
> Q:  And consistent with what we talked about, is it LuLaRoe's position that the tax that was charged to the 11 named plaintiffs was based on the taxing jurisdiction of the consultant they purchased from?
> A:  Yes.
> Q:  And the sales tax that LuLaRoe collected from each of the named plaintiffs was paid into the taxing jurisdiction which the consultant resides?
> A:  Yes.
> Q:  And not into the jurisdiction where the 11 – any of the jurisdictions where the 11 named plaintiffs live"
> A:  Yes.
> Q:  Okay.  And some of the named plaintiffs bought from consultants in multiple states that charge sales tax; is that right?

A: They just bought from multiple consultants from multiple states.

Q: Yes.

A: Some of them had sales tax.  Some of them did not.

. . .

Q: Okay.  And if, for example – and I don't know the correct number, but say [plaintiff Rachael Webster] purchased from consultants in five different states that charged sales tax, it's correct that the money that was collected from Ms. Webster would have been paid into those five different states?

A: Yes.

Q: And that answer would be the same for each of the plaintiffs?

A: Yes.

Q: And would that answer be the same, then, for each of the end users that received LuLaRoe products in one of the 11 jurisdictions named in the amended complaints when they purchased from a consultant in a state with sales tax?

A: Yes.  That was based on what our system could do at the time.

(*See id.*, at 155:7-157:5).

When asked the total number of sales and total dollar amount charged to end consumers in "tax" when a product was delivered into a jurisdiction that does not authorize a collection of tax on the clothing that LuLaRoe sells, the magnitude of LuLaRoe's unlawful and deceptive conduct was clear:

| Jurisdiction | Total Transactions | Total Charged |
| --- | --- | --- |
| Alaska | 72,503 | $      255,483.35 |
| New York | 104,144 | $      329,922.83 |
| Delaware | 72,944 | $      232,585.83 |
| Massachusetts | 314,435 | $  1,002,941.12 |
| Minnesota | 304,617 | $  1,018,459.57 |
| Montana | 52,129 | $      187,333.33 |
| New Hampshire | 93,034 | $      297,021.67 |
| New Jersey | 358,268 | $  1,154,229.27 |

| | | |
|---|---|---|
| Oregon | 200,450 | $ 694,636.75 |
| Pennsylvania | 955,507 | $ 3,003,807.92 |
| Vermont | 53,699 | $ 170,180.32 |
| **TOTAL** | **2,581,730** | **$ 8,346,601.96** |

(*See* Exh. P, at Interrogatory Nos. 1 and 2).[9]

From April 2016 through June 1, 2017, *LuLaRoe overcharged the class members more than $8.3 million in unlawful tax*.  (*See id.*)

### H.  LuLaRoe's Improper Attempt to "Pick Off" the Plaintiffs and Putative Class Members

From April 2016 until a complaint was filed in this action, LuLaRoe stood by its decision to systematically and fraudulently surcharge its customers in the guise of "tax" going so far as to publish a white paper alleging that its improper conduct was lawful.  Once its fraudulent practices became the subject of this class action (and media attention), however, LuLaRoe changed its tune. In a statement published on February 27, 2017, (after the filing of the complaint in this action) a LuLaRoe spokesperson told Forbes Magazine:

---

[9]     On December 5, 2017—the literal eve of Plaintiffs' Motion for Class Certification deadline—LuLaRoe served a Supplemental Response to Plaintiffs' First Set of Interrogatories Directed to Defendant. In addition to this damages chart, Defendant's Supplemental Response identified another 9,448 transactions, for which LuLaRoe overcharged class members $52,646.27 in the guise of "sales tax." (*See* Exh. Q). LuLaRoe claims to have identified these additional charges on November 21, 2017, which is interesting in light of its repeated claims to have already refunded class members any money they're owed. (*See* Defendant's October 10, 2017 Memorandum of Law In Opposition to Plaintiffs' Emergency Motion To Compel, Doc. No. 68 ("Indeed, LLR candidly admits Audrey's flaws and the over collection of sales taxes under its 2016 sales tax policy. [] For this reason, LLR undertook to voluntarily refund all over-collected sales taxes to consumers residing in taxing jurisdictions that do not charge sales taxes on clothing, and has issued refunds to all credit and debit cards used for these purchases, despite Plaintiff's attempt to enjoin LLR from issuing these refunds.")).

10

> We have been aware of sporadic problems with our former payments vendor, which have increased over the past year with the fast growth of our company.
>
> …
>
> The issue involved 'our former payments vendor, which had a technology system failure that misidentified the accurate location of certain individuals.' Since that time, according to a company spokesperson, '[w]e have immediately reimbursed any individual whom we could identify as having been improperly charged sales tax.' Further, the company says '[w]e are proactively working to ensure that all affected individuals are refunded.'

*See* Forbes, Popular Fashion Line LuLaRoe Sued Over Sales Tax Charges, Feb 27, 2017, available at https://www.forbes.com/sites/kellyphillipserb/2017/02/27/popular-fashion-line-lularoe-sued-for-overcharging-customers-sales-tax/#5f4aeac7176d (last accessed Dec. 6, 2017).

As part of an apparent effort to put the genie back in the bottle regarding its unlawful collection of taxes at issue in this lawsuit, LuLaRoe engaged in a confusing, ad hoc, refund scheme in an effort to escape responsibility for its bad acts. (*See* Motion to Enjoin Communication with Class and Brief in Support, Doc. Nos. 11 and 12). While these efforts will presumably be framed by Defendant as a belated effort to "do the right thing" by refunding the unlawful charges, LuLaRoe's refund effort – undertaken *after* it was caught with its hand in the cookie jar – does not save it from liability and, instead, is a concession of fault.

LuLaRoe claims it had a "plan" to refund the improper charges to all class members at some unknown future point, but did not actually undertake to make refunds to the class members until after the Complaint was filed.[10] (*See* Exh. B, at 72:22-74:7; Exh. O, at ¶ 27). Shockingly,

---

[10] Despite its allegation of having a "plan" to refund the charges prior to the Complaint being filed, LuLaRoe has refused to produce any documents related to its purported "plan." (*See* Motion to Compel, Exhibit E, Doc. No. 65-5, at p. 4 (Letter from LuLaRoe's counsel claiming that LuLaRoe's "plan" to refund overcharged taxes is not relevant to class certification)). At the urging of LuLaRoe's counsel, Plaintiffs' counsel asked deposition questions about the "plan" under a reservation of rights to challenge any use of the "plan" by LuLaRoe as a defense to class certification in light of its refusal to produce documents related to the same.

LuLaRoe takes the position that the refund "plan" was in place as of April 2016 – *at the same time it created and distributed the false white paper and sales tax memorandum to its retailers*.  (Exh. B, at 72:22-74:7).  Hence, LuLaRoe unequivocally knew when it instituted its 2016 Tax Policy that it was not in compliance with the laws and that the operation and effect of the policy would cause harm to its end customers.  (*See* Exh. D, at 92:23-93:5).  Moreover, LuLaRoe actively hid this knowledge until after it was sued in this class action. (*See* Exh. D, at 112:22-113:4 (LuLaRoe admitted that the purported "plan" was never announced to retailers or end customers before the Complaint was filed); *see also* Exh. B, at 73:19-74:7; *see also* Exhs. I and N (LuLaRoe continued to disseminate the sales tax memorandum to retailers and customers up until February 2017, when the Complaint was filed)).

LuLaRoe manufactured its own "solution" to address its tax dilemma – the 2016 Tax Policy – and, by doing so, perpetrated a fraud on its consumers.  Its suggestion in many pleadings to date that its attempt to manufacture its own "remedy" to that fraud somehow excuses its egregious conduct is disingenuous.  LuLaRoe's "remedy" provided class members with no basis for ascertaining what the amount of the overcharge was or whether the entire amount of the unlawful charge was refunded, nor did it compensate Plaintiffs or the class members for the full amount of their damages under the class claims (*i.e*, interest, statutory, and/or punitive damages).  LuLaRoe admits that it refunded *only* the amounts it improperly charged without any interest or other damages added.  (*See* Exh. D, at 132:2-6, 133:1-134:6).  Indeed, while LuLaRoe alleges that it has refunded the $8.3 million it overcharged, LuLaRoe has suffered *absolutely no* consequence for its knowing and unlawful conduct towards its end consumers because it recovered all of those funds from the various taxing jurisdictions.  (*See* Exh. D, at 157:6-158:6) (confirming that the tax issue was a "zero-sum" game for LuLaRoe because it recouped all of the overcharges from the taxing

jurisdictions that it paid them into).  This scenario is the exact reason why states have consumer protection statutes.  LuLaRoe's belated refunds do nothing to defeat the class claims or class certification.

## I.   LuLaRoe Benefited From the Use of Audrey and the 2016 Tax Policy

In pleadings to date, LuLaRoe also appears to claim that it did not benefit from its bad acts because it placed any unlawful "tax" it collected into a sequestered account, and paid that money to the retailers' (notably, not the consumers') taxing authority.  (*See, e.g.,* Exh. O, at ¶¶ 8-9).  Such position ignores that most of the causes of action alleged herein are intended to protect the party harmed, not focus on whether the bad actor benefitted from its deceptive conduct.  LuLaRoe's position, however, demonstrates its continued willingness to misrepresent the facts to hide the substantial benefit behind its systematic consumer fraud.

As stated above, LuLaRoe required it retailers to use Audrey – the POS system that it had programmed to systematically and unlawfully collect tax.  (*See* footnote 2, above).  For its retailers' use of Audrey, LuLaRoe received incentive payments from the payment processing vendor, totaling approximately $5.6 million in 2016 and $1.9 million in just the first two months of 2017. (*See* Exh. B, at 68:8-25).  At the same time that LuLaRoe overcharged consumers over $8 million, LuLaRoe garnered $7.5 million in processing fees for the consumers' use of the Audrey POS system to process the consumers' payments.

In addition, LuLaRoe also received certain tax benefits.  Many taxing authorities provide incentives to businesses for collecting sales and use tax from consumers.  Since 2016, LuLaRoe has received and retained at least $676,803.43 of the fraudulent tax that it collected.  (*See* Exh. B, at 71:6-72:4).

Prior to implementing its unlawful 2016 Tax Policy, LuLaRoe was overpaying its tax obligations to taxing authorities on all purchases made by class members located in jurisdictions

which do not charge tax on clothing (when no tax was in fact charged because the toggle switch was used). (*See* Section II(C), above). LuLaRoe was indiscriminately paying tax because the information obtained from LuLaRoe's POS system did not distinguish between retailers' in-state sales and out of state sales. (*See id.*; Exh. D, at 144:3-145:18). By implementing its 2016 Tax Policy, LuLaRoe passed the costs associated with the shortcomings of its POS system and its indiscriminate tax payments onto its end consumers, including the class members. (*See, e.g.*, Exh. R ("the temporary measure has been put into place to avoid audit scrutiny from the states as we continue to report sales and write supplementary checks to cover shortages when appropriate reporting is not readily available.")). LuLaRoe's fraudulent 2016 Tax Policy was implemented at the expense of the class and was patently designed to save LuLaRoe from paying both: (i) the immediate costs associated with fixing the systemic flaws of its POS System; and (ii) its tax overpayments to the taxing authorities caused by Audrey's failures. Any suggestion by LuLaRoe that it did not receive a benefit from its deceptive acts is unsupportable.

## III.    PROPOSED CLASSES

Plaintiffs request that the Court certify the following Classes pursuant to Federal Rule of Civil Procedure 23(b)(3):

> **Pennsylvania Class:**  All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Pennsylvania.

> **New York Class:**  All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into New York.

> **Minnesota Class:**  All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Minnesota.

**New Hampshire Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into New Hampshire.

**Delaware Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Delaware.

**Alaska Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Alaska.

**Oregon Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Oregon.

**Montana Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Montana.

**New Jersey Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into New Jersey.

**Massachusetts Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Massachusetts.

**Vermont Class:** All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were or will be delivered into Vermont.

Excluded from the classes are Defendant, as well as its past and present officers, employees, agents or affiliates, any judge who presides over this action, and any attorneys who enter their appearance in this action. Also excluded from the Alaska and New York classes are any persons who live in a locality where the locality assesses a use tax on the clothing that LuLaRoe sells. Plaintiffs seek to certify these classes under each class's state's respective laws.

15

## IV.   ARGUMENT

### A.  Rule 23(a) Prerequisites are Established

Class actions provide an efficient means of resolving claims arising from a systematic scheme to defraud consumers because they enable courts to avoid thousands of individual trials with overlap in scope, issues, testimony, and experts.  Under Fed R. Civ. P. 23(a), a movant must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.[11]  Fed. R. Civ. P. 23(a).  As detailed below, all of the Rule 23(a) criteria are satisfied here.

### 1.   Numerosity

To establish numerosity the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is presumed when the class is shown to exceed 40 members.  *In re Modafinil Antitrust Litig.*, 837 F.2d 238, 250 (3d Cir. 2016).

Here, numerosity is satisfied for each of the classes.  According to LuLaRoe, it charged "sales tax" on 2.5 million transactions shipped into the class states, ranging by state from a low of

---

[11]      Although not a formal requirement under Rule 23(a), "[a]n essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria."  *In re Community Bank of N. Virginia Mortg. Lending Practices Litig.* ("CBNV III"), 795 F.3d 380, 396 (3d Cir. 2015).  Ascertainability requires class members to be identifiable "without extensive and individualized fact-finding or mini-trials."  *Id.*  "[I]f a class cannot be ascertained in an economical and administratively feasible manner, significant benefits of a class action are lost."  *Id.*  Here, LuLaRoe admitted in its 30(b)(6) deposition that all class members are easily ascertainable and it has already been able to ascertain the members of the class.  Since these records can be used to easily identify each class member, ascertainability is met in this case.  *See id.* at 397 (finding ascertainability where the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

52,379 transactions (Montana) to a high of 958,525 transactions (Pennsylvania), for total overcharges of more than $8.3 million. While this data reflects transactions rather than purchasers, it can be inferred that each class has over 40 class members that were charged a non-existent tax. *See Heinzl v. Cracker Barrel Old Country Stores, Inc.*, No. 14-cv-1455, 2016 WL 2347367, at *19 (W.D. Pa. Jan. 27, 2016), *report and recommendation adopted*, No. 14-cv-1455, 2016 WL 1761963 (W.D. Pa. Apr. 29, 2016), *Fed. R. Civ. P. 23(f) appeal denied*, No. 16-8042 (3d Cir. Aug. 12, 2016) (relying on common sense to find numerosity satisfied).

## 2. Commonality of Issues

To establish commonality, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *CBNV III*, 795 F.3d 380 at 397. "[T]he focus of the commonality inquiry is not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class members." *Id.* This element is satisfied when a claim arises from the same "event or practice or course of conduct that gives rise to the claims of other class members." *Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903, 2 (N.D. Ill. Sept. 30, 2014).

Here, LuLaRoe uniformly overcharged Plaintiffs and all class members. It employed a systematic scheme that improperly charged tax based on the retailer's taxing jurisdiction, regardless of where the purchaser was located. The conduct of LuLaRoe with respect to the named Plaintiffs and the class members that each Plaintiff seeks to represent was the same. Each Plaintiff and each class member purchased LuLaRoe clothing from an out of state retailer and was charged a tax based on the retailer's tax rate, rather than their own jurisdiction's use tax rate (which, for

17

the class, is zero).  Thus, while only one question of law *or* fact is required, there are many

questions of law and fact common to the proposed classes, including:

- Whether Defendant collected funds from Plaintiffs and individual class members under a nonexistent tax;

- Whether the law authorizes these converted funds;

- Whether Defendant lacks authority under the law to collect funds under a nonexistent tax;

- Whether Defendant's illegal and unauthorized collections caused its unjust enrichment;

- Whether Defendant's conduct was fraudulent;

- Whether Defendant's conduct was deceptive and likely to mislead consumers; and

- Whether Defendant converted funds the lawfully belonged to Plaintiffs and the class members.

(*See* Amended Class Action Complaint, Doc. No. 53, at ¶ 66).  Additional questions of law and

fact common to the proposed classes, include:

- Whether Defendant charged Plaintiffs and class members tax based upon the location of the consultant or retailer who shipped the goods sold;

- Whether Defendant knew that its tax policy and/or POS system overcharged Plaintiffs and class members a tax they did not owe;

- Whether Defendant redesigned its point of sale system to force Plaintiffs and class members to pay a tax they did not owe;

- Whether Defendant redesigned its POS system such with knowledge that such redesign would force Plaintiffs and class members to pay a tax they did not owe; and

- The proper method by which to measure damages to which the classes are entitled.

The charges at issue are either unlawful to all class members, or as to none of them.  Once

Plaintiffs and the Classes establish that LuLaRoe's conduct was illegal, the Plaintiffs and the

Classes are entitled to damages.  Conversely, if they do not establish liability, then none are entitled

to recovery.  Put differently, injury to Plaintiffs and their respective class is capable of being proven

(or disproven) class-wide. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (holding

that commonality is satisfied where common questions generate common answers 'apt to drive the

resolution of the litigation").  As a result, the commonality requirement of Rule 23(a) is satisfied

here.

### 3.    Typicality of Claims

To establish typicality, "the claims or defenses of the representatives parties [must be]

typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is established

"where there is a strong similarity of legal theories' or where the claim arises from the same

practice or course of conduct.  *In re Natl. Football League Players Concussion Injury Litig.*, 821

F.3d 410, 428 (3d Cir. 2016), cert. denied sub nom., *Armstrong v. Natl. Football League*, 137 S.

Ct. 607 (2016).  "[M]inor variations in the fact patterns underlying individual claims" are not

sufficient to defeat a class, especially where, as here, plaintiffs challenge a broadly applicable

policy or practice."  *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d. Cir. 1993).

Similar to commonality, typicality is established here because Plaintiff's claims arise out

of the same practice as the claims of each class member: Defendant's uniform overcharge of non-

existent taxes.  Since this case is "challenging the same unlawful conduct which affects both the

named plaintiffs and the putative class," typicality is satisfied.  *In re Natl. Football League*, 821

F.3d at 428; *see also Langan v. Johnson & Johnson Consumer Cos., Inc.*, Nos. 3:13-cv-1470 and

1471, 2017 WL 985640, *12 (D. Conn. Mar. 13, 2017).

### 4.    Plaintiffs and Counsel Can Adequately Represent The Interests Of The Classes

To establish adequacy, the representative parties and their counsel must "fairly and

adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4).  The adequacy requirement

"tests the qualifications of class counsel and the class representatives," and "also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." *In re Natl. Football League*, 821 F.3d at 428. Here, the named Plaintiffs are committed to vigorously litigating this matter and protecting the interests of the putative class members.[12] There has already been significant litigation activity and the Plaintiffs have already demonstrated a commitment to the aggressive prosecution of the action on behalf of the class. Each Plaintiff has produced documents responsive to requests from Defendant, has been in contact with their attorneys to remain up to date on the litigation, reviewed responses to discovery requests and verified the same. Indeed, ten of the named Plaintiffs have been deposed by LuLaRoe's counsel, including a number of Plaintiffs who have traveled overnight to attend their deposition. Moreover, Plaintiffs have retained counsel who are experienced in class litigation and who have routinely been appointed as lead counsel in significant class cases, including cases within this District. (*See* Exh. U (Declaration of R. Bruce Carlson)). For these reasons, the Court should readily conclude that Plaintiffs and their counsel will adequately and fairly represented the interests of the Class.

---

[12]    One of the Plaintiffs, Christine Prokop, who represents the Alaska class, has asked that another class representative be substituted for her because of certain personal issues she is facing that makes it difficult for her to continue being active in this litigation. (*See* Motion for Substitution of Class Representative and Brief is Support, Doc. Nos. 73 and 74). This Court has wide discretion related to substitution of class representatives and may substitute a class representative in its entry of certification. *See*, *e.g.*, *In re Natn'l Australia Bank Securities Litg.*, No. 03 Civ. 6537, 2006 WL 3844463, *4 (S.D. N.Y. Nov. 8, 2006) (permitting substitution of lead plaintiff in class action after dismissal of all named plaintiffs from the action on the basis of adequacy); *In re Wellbutrin XL Antitrust Litg.*, 282 F.R.D. 126, 139 (E.D. Pa. 2011) (quoting *Manual for Complex Litigation (Fourth)* § 21.26) ("Courts generally allow class counsel time to make reasonable efforts to recruit and identify a new representative who meets the Rule 23(a) requirements. The Court may permit intervention by a new representative or may simply designate that person as a class representative in the order granting class certification."); *Shankroff v. Advest, Inc.*, 112 F.R.D. 190, 194 (S.D. N.Y. 1986) (granting class certification subject to an order to propose at least one plaintiff to proceed as representative of the class because class representative was held to be inadequate).

## B.  Rule 23(b)(3) Prerequisites are Established

In addition to satisfying the elements of Rule 23(a), a party seeking class certification must also satisfy one of the subsections of Rule 23(b).  As noted above, Plaintiffs seek certification under Rule 23(b)(3).  Under Fed. R. Civ. P. 23(b)(3), a movant must demonstrate that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  As demonstrated below, Plaintiffs' proposed classes readily satisfy Rule 23(b)(3)'s requirements.

### 1.  Predominance

To establish predominance, the "questions of law or fact common to class members [must] predominate over any questions affecting only individual members[.]"  Fed. R. Civ. P. 23(b)(3).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *CBNV III*, 795 F.3d at 399 (same).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson Foods*, 136 S. Ct. at 1045; *CBNV III*, 795 F.3d at 399 ("If proof of the *essential elements* of the cause of action requires individual treatment, then class certification is unsuitable.") (emphasis in original); *see also In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 645 (S.D. Fla. 2015) ("It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions.").

Third Circuit precedent provides that "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). It is well established that predominance is satisfied where the claims of a plaintiff and the putative class members "arise from the same alleged fraudulent scheme." *CBNV III*, 795 F.3d at 400; *In re Community Bank of N. Virginia Mortg. Lending Practices Litig. ("CBNV I")*, 418 F.3d 277, 309 (3d Cir. 2005); *see also Tyson Foods*, 136 S. Ct. at 1045-49; *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see also see also In re Checking Account Overdraft Litig.*, 281 F.R.D. at 676 (same).

A Rule 23(b)(3) certification ruling is not intended "to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 187 (E.D. Pa. 2016), *reconsideration denied*, No. 06-0620, 2017 WL 696983 (E.D. Pa. Feb. 22, 2017). Certification under various state laws is proper when, as here, the "varying state laws can be grouped by shared elements and applied in a unit in such a way that the litigation class is manageable." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004).

### a.   State Law Variations in Classes

"Variations in state law do not necessarily defeat predominance." *Sullivan*, 667 F.3d at 297 ("predominance is not considered deficient merely 'because claims were subject to the [varying] laws of fifty states'"). "'Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test'; rather, '[a]s long as a sufficient constellation of common issues

binds class members together, variations in the sources and application' of applicable laws will not foreclose class certification." *Id.* at 301. The Third Circuit explained in *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*:

> Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit. This Court has affirmed a class certification based on a "creditable showing, which apparently satisfied the district court, that class certification [did] not present insuperable obstacles" relating to variances in state law. In this instance Krell has failed to demonstrate that the differences in applicable state law were sufficient to foreclose a similar approach. In support of class certification, plaintiffs compiled "a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." The court concluded that the "elements of these common law claims are substantially similar and any differences fall into a limited number of predictable patterns."

148 F.3d 283, 315 (3d Cir. 1998) (certifying a nationwide class for fraud and deceptive conduct claims arising out of defendant's deceptive sales practice that affected over 8 million claimants throughout the country). Although class members may possess differing remedies based on varying state statutes, where the actions asserted are not sufficiently anomalous, class certification is proper. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1998) (certifying a nationwide settlement class and holding "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims"); *see also Langan*, Nos. 3:13-cv-1470 and 1471, 2017 WL 985640 at *14 (certifying a consumer protection litigation class action under 17 states' statutes).

**b. Plaintiffs' consumer protection claims satisfy the predominance inquiry**

Plaintiffs seek to pursue consumer protection claims under the laws of Alaska, Delaware, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont. "Predominance is 'a test readily met in certain cases alleging consumer . . . fraud'

23

particularly where, as here, uniform practices and misrepresentations give rise to the controversy." *In re Checking Account Overdraft Litig.*, 307 F.R.D. at 645 (citing *Amchem Prods., Inc. v. Windsor*, 521 US at 625)); *see also In re U.S. Foodserv. Pricing Litig.*, 729 F.3d 108, 120 (2d. Cir. 2013) (holding that class actions may be reasonably litigated through use of "legitimate inferences based on the nature of the alleged misrepresentations at issue.")).   In analyzing the predominance standards, "[c]ases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 329 (S.D. Ohio 2009).

Plaintiffs provide an analysis of each of the consumer protection laws that Plaintiffs' seek to have their respective classes certified under, which is attached hereto as **Appendix A**.  Each of the ten states' consumer protection laws serve the same general purpose – to protect consumers from deceptive or unfair trade practices, such as LuLaRoe's conduct here.  "[C]onsumer class actions [provide] an indispensable mechanism for aggregating claims when the individual stake is low and the similarity of the challenged conduct is high." *Reyes*, 802 F.3d at 491.

The only potentially material difference among the ten states' laws is whether the plaintiffs and class must show reliance as proof of causation.  At least seven of the states—Alaska, Delaware, Montana, New Hampshire, New Jersey, New York, and Vermont—do ***not*** require a plaintiff or a class to show reliance as either an element of their consumer protection statutes, nor for causation. (*See* Appendix A).  Additionally, Minnesota has no reliance requirement under its Prevention of Consumer Fraud Act.  (*See id.*).  Hence, there is no individual reliance inquiry that could theoretically be an impediment to a finding of predominance.  No states require reliance as an element of a claim, and only two states – Oregon, and Pennsylvania – as well as Minnesota's Deceptive Trade Practices Act, require a showing of reliance for causation.  (*See id.*)  However,

even in these states, the reliance requirement may be satisfied on a class-wide basis under the facts of this case, rather than through an individual showing of reliance by class members.

As one district court explained, "there are at least three situations in which courts typically find common issues predominate in fraud cases" despite any concerns about individual issues of reliance:

> "(1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance." *Newberg* § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. *See, e.g., Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1253 (2d Cir.2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits ... have held that oral misrepresentations are presumptively individualized."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 319 (3d Cir.1998)(certifying class where alleged misrepresentations were written and uniform); *Spencer v. Hartford Fin. Servs. Grp., Inc.,* 256 F.R.D. 284, 297 (D.Conn.2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members—investors in the defendant company—are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information. *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta,* 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)(citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Basic Inc. v. Levinson,* 485 U.S. 224, 245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

*Daye v. Cmty. Fin. Serv. Centers, LLC*, 313 F.R.D. 147, 169, n.12 (D. N.M. 2016).  The states here that have no reliance requirement fall squarely within the third exception.  Additionally, the states that have a reliance requirement for causation, fall within the first exception, as explained in more detail below.

While some consumer protection actions may not be suitable for class treatment due to the differences in the levels of reliance by individual class members, consumer protection class actions are appropriate if the reliance element may be satisfied on a class-wide basis without the need for

testimonial evidence from the class plaintiffs.  *See Allen v. Holiday Univ.*, 249 F.R.D. 166, 193 (E.D. Pa. 2008) (certifying class of individuals under Pennsylvania Unfair Trade Practices and Consumer Protection Act where class was charged fees in excess of the law and stating class certification was appropriate because "if proven, the alleged misconduct resulted in a monetary loss for each person who purchased a health club membership. … [A]n excessive initiation fee that is paid by a consumer necessarily causes an ascertainable monetary loss[, and since the] alleged violation is a uniform policy and practice of charging excessive fees, there is no doubt as to the *cause* of the ascertainable monetary loss"); *Strawn v. Farmers Ins. Co. of Oregon*, 258 P.3d 1199, 1212 (Or. 2011), *adhered to on reconsideration*, 256 P.3d 100 (Or. 2011) (Class-wide reliance may be inferred from evidence common to the class when, for example, "the misrepresentation was uniformly made to all class members, as through standardized documents."); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 314 (upholding district court's approval of settlement class where various states' consumer protection laws were asserted and the district court held that "reliance is an issue secondary to establishing the fact of defendant's liability"); *see also Reyes*, 802 F.3d 489-90 (overturning district court's denial of class certification for a RICO claim because reliance could be shown on a class-wide basis); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118.

Exactly analogous to this case, the causation requirement – *i.e.*, that the Plaintiffs and class members' injury (or ascertainable loss) result from the Defendant's unfair or deceptive practice – was addressed in detail in a recent Pennsylvania state court case where the plaintiff asserted a class action for conversion, breach of constructive trust, unjust enrichment, and unfair trade practices based upon the defendant's "pattern and practice of deceptively overcharging sales tax on the value of coupons tendered for the purchase of taxable goods."  *Farneth v. Wal-Mart Stores, Inc.*, No.

GD-13-011472 (Pa. Com. Pl. Ct. March 21, 2017) (Allegheny County, Colville, J.), attached to Plaintiffs' Motion for Class Certification as Exh. S.  The *Farneth* court explained that while a finding of reliance is typically necessary to prevail on an unfair trade practices claim, individual reliance need not be shown if the "ascertainable losses necessarily flow from the fraud or deceit." *Id.* at p.3; *see also Toth v. Nw. Sav. Bank*, No. GD-12-008014, 2013 WL 8538695, at *4 (Pa. Com. Pl. Ct. Mar. 1, 2013) (Allegheny County, Wettick, J.) ("In fraud cases, the requirement that a plaintiff establish reliance is imposed solely to determine the extent to which (if at all) the plaintiff or a member of the class was actually harmed by the fraudulent or deceptive conduct. Where, as in the present case [(alleging consumer protection claims)], a lawsuit is brought only by persons who were actually harmed by the bank's deceptive conduct, and who sustained actual losses as a result of improper overdraft charges, a reliance requirement serves no purpose.").

The *Toth* Court explained that, where there is systematic overcharging of consumers, "[t]he fraud or deceit is taking the money of plaintiff and the class members without permission. Plaintiff's ascertainable losses are the overcharges imposed on plaintiff because of defendant's scheme for calculating overdraft fees. Testimony as to reliance is not needed to establish ascertainable losses." *Toth*, No. GD-12-008014, 2013 WL 8538695, at *9.  It then went into great detail related to causation under the consumer protection statute:

> In fraud cases, the requirement that a plaintiff establish reliance is imposed solely to determine the extent to which (if at all) the plaintiff or a member of the class was actually harmed by the fraudulent or deceptive conduct. Where, as in the present case, a lawsuit is brought only by persons who were actually harmed by the bank's deceptive conduct, and who sustained actual losses as a result of improper overdraft charges, a reliance requirement serves no purpose.
>
> The Consumer Protection Law, as written, permits a consumer to bring a private action if the consumer has suffered any ascertainable loss of money as the result of the use or employment of fraudulent or deceptive conduct. To recover, the plaintiff must establish that plaintiff was a victim of a fraud or deceit (Requirement One) and that plaintiff suffered an ascertainable loss (Requirement Two).

27

Where the fraud or deceit is a misrepresentation, Requirement One is met if the plaintiff can show a material misrepresentation and an intent to misrepresent. However, Requirement Two is not met without a showing justifiable reliance.

EXAMPLE ONE: The insurance agent advised the customer-a forty-five-year-old accountant-that if the accountant/customer makes a monthly payment of $100 until age sixty-five, the accountant will have a fully paid insurance policy that will provide insurance in the amount of $1 million upon the accountant's death. The accountant later learns that at age sixty-five he is guaranteed a fully paid policy that will pay only $30,000 upon the accountant's death. The law is not going to presume that the accountant, at the time he purchased the policy, believed that payments of $24,000 over a twenty-year period would produce a $1 million insurance policy. Thus, reliance must be shown to establish an ascertainable loss.

However, a showing of actual reliance should not be required when ascertainable losses necessarily flow from the fraud or deceit. Consider the following examples:

EXAMPLE TWO: The agreement between the car dealer and the purchasers permitted the car dealer to add the manufacturer's transportation fees to the agreed-upon purchase price. The car dealer pays only $71 to the manufacturer for transportation fees but charges the purchasers $171 for transportation fees. Upon a showing that the car dealer is fraudulently overcharging purchasers, each member of the class of persons who paid the inflated amount should be entitled to recover the difference between the overcharged amount and the actual costs in addition to the other relief provided for in Section 9.2 of the Consumer Protection Law.

EXAMPLE THREE: A financial advisor places orders on behalf of his clients with a broker who, at the request of the financial advisor, sends an invoice to the advisor for a placement fee of $100 for each order. The financial advisor passes on the fee to the client. The broker, in fact, does not charge placement fees. Upon proof of the kickback scheme, the clients of the financial advisor should be entitled to recover the placement fee and the other relief provided for in Section 9.2 of the Consumer Protection Law.

EXAMPLE FOUR: The contractor of a housing development, who knows of the requirements of the building code, is, unbeknownst to the purchasers, using roofing materials that do not comply with code standards. The use of noncomplying roofing materials was discovered when a fire at one of the dwellings resulted in every homeowner being required by the building inspector to replace his or her roof. Each homeowner should be entitled to recover, at a minimum, the cost of replacing the roof and other relief provided by Section 9.2 of the Consumer Protection Law upon a showing that the contractor knowingly installed roofs that did not comply with code standards.

In Examples Two and Three, the defendants obtained money belonging to each member of the class as a result of the defendants' representations and omissions. Thus, reliance testimony is not needed to establish an ascertainable loss.

28

In Example Four, reliance is not a requirement for establishing that the class members sustained an ascertainable loss because the loss flows necessarily from proof of the fraud.

For Examples Two and Three, the Consumer Protection Law should not be construed to require the named plaintiffs and class members to offer speculative testimony as to whether they would have purchased the car (Example Two) or placed orders (Example Three) even if they had known that they would be cheated. The inflated transportation fee (Example Two) and charging the client a non-existent placement fee (Example Three) are the fraudulent acts, and the ascertainable losses are the fraudulent charges.

For Example Four, if the Pennsylvania courts would require the named plaintiff and the class members to offer speculative testimony that they would not have purchased the property if told that the roof did not comply with code requirements and would need to be replaced, they would be creating reliance requirements that are so robust as to almost eliminate class actions based on deceptive conduct. Since the Consumer Protection Law never mentions reliance as a prerequisite for recovery, this cannot be what the Legislature intended.

*Id.* at *4-6. Class-wide reliance for causation was also addressed in detail in *In re U.S. Foodservice Inc. Pricing Litig.*, where the court explained that "fraud claims based on uniform misrepresentations to all members of a class 'are appropriate subjects for class certification' because, unlike fraud claims in which there are material variations in the misrepresentations made to each class member, uniform misrepresentations create 'no need for a series of mini-trials.'" 729 F.3d at 118. The court further explained that fraud claims are ***not*** beyond the reach of Rule 23 merely because class members must "show causation by establishing reliance on a defendant's misrepresentations, provided that individualized issues will not predominate." *Id.* at 119. Specifically, payment may "constitute circumstantial proof of reliance upon a financial representation." *Id.* (*citing Klay v. Humana, Inc.*, 382 F.3d 1241, 1258 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)). The Second Circuit explained further:

In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly

owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."

*Id.* at 119-20; *see also Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 335 (E.D.N.Y. 2000) ("Though reliance is a requirement for establishing causation where predicate acts based in fraud are alleged, the nature of the reliance is not a constant. Where the fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causation should require reliance on identifiable misrepresentations. . . . Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people."); *see also* Fed. R. Civ. P. 23(b)(3) Advisory Committee Notes ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").

Here, Plaintiffs do not need to show class-wide reliance in the states in which consumer protection claims were asserted and the consumer protection claims should be certified in those states.  For the remaining states that have a reliance requirement, reliance may be shown on a class-wide basis under the instant facts.  Plaintiffs and the class members all purchased LuLaRoe clothing from retailers outside of their state to be shipped into their state.  Each Plaintiff and every class member received an invoice from the retailer that was generated by LuLaRoe's Audrey

system.  The invoice represented that LuLaRoe was collecting a "tax" on the purchase.  Each Plaintiff and every class member paid the invoice that implicitly represented they were paying a proper tax when, in fact, no such tax was owed by the Plaintiffs and class members – a fact readily known by LuLaRoe.  As was the situation in *In re U.S. Foodservice Inc. Pricing Litig.*, the payment of these invoices that included an unlawful tax when no such tax was owed constitutes sufficient "circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."  The situation set forth here is analogous to examples two and three enumerated by the *Toth* Court, wherein individual reliance is not required because the ascertainable loss to the Plaintiffs and class members was directly as a result of LuLaRoe's conduct: "[LuLaRoe] obtained money belonging to each member of the class as a result of the [LuLaRoe's] representations and omissions . . . reliance testimony is not needed."

LuLaRoe's conduct is the exact type of systematic, unfair practice that the consumer protection statutes were intended to protect against.  Plaintiffs seek to have their classes certified under the consumer protection laws of Alaska, Delaware, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont.  Alternately, Plaintiffs seek to have their class certified under the consumer protection laws that do not require any proof of reliance – Alaska, Delaware, Montana, New Hampshire, New Jersey, New York, and Vermont, as well as Minnesota's Prevention of Consumer Fraud Act.

### c.  Plaintiffs' conversion claims satisfy the predominance inquiry

Plaintiffs seek certification of their conversion claims under ten of the Plaintiffs' relevant jurisdictions – Alaska, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New

York, Oregon, Pennsylvania, and Vermont.  Plaintiffs provide an analysis of conversion under each of the class states, which is attached hereto as **Appendix B**.

The causes of action for conversion in each of these ten states is substantially similar – requiring a wrongful exercise of dominion or control over the property of another.  (*See* Appendix B).  Alaska, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont courts all specifically permit a claim for conversion of money, such as is alleged here.  (*See id.*).  Delaware does not recognize a claim for conversion of money and, therefore, Plaintiffs do not seek certification of a conversion cause of action under Delaware law.  (*See id.*).

Here, Plaintiffs can prove conversion under each states' law through the common facts and the common improper and deceptive conduct of LuLaRoe, which is uniform toward the Plaintiffs and the class members.  LuLaRoe stole money from the Plaintiffs and class members under the guise of a "tax" when there was no such tax.  LuLaRoe knew it was not entitled to take those funds from the Plaintiffs and class members, but did so, and dispossessed the Plaintiffs and class members from those funds.  Plaintiffs' and the class members' possessory interest in the "tax" payments was substantially interfered with by LuLaRoe's knowing, unlawful conduct.

Plaintiffs seek to certify their claim for conversion under the Alaska, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont laws.

### d.  Plaintiffs' contract-based claims satisfy the predominance inquiry

Plaintiffs also bring claims for unjust enrichment and for breach of constructive trust under all eleven of the Plaintiffs' relevant jurisdictions – Alaska, Delaware, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont. Plaintiffs

provide a survey of unjust enrichment, attached hereto as **Appendix C**, and breach of constructive trust, attached hereto as **Appendix D**, under each of the class states.  Based upon the facts of the First Amended Complaint, there are no material state law differences among either claim which require individualzed determinations such that certification is "insuperable." *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.1986).

While the laws of the states governing unjust enrichment are expressed in varying words, there are few real differences.  (*See* Appendix C).  Most states have simply adopted a variation of the definition of unjust enrichment in Restatement (First) of Restitution § 1, which provides that a party may be required to make restitution if she is unjustly enriched at the expense of another.  (*See id.*).  To this end, in each state, the focus of the claim is whether the defendant was unjustly enriched.  (*See id.*).  Indeed, "[i]n looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs.  That is a universal thread throughout all common law causes of action for unjust enrichment."  *In re Abbott Laboratories Norvir Anti-Tr. Litig*., 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007) ("*In re Abbott Labs*").  "The 'idiosyncratic differences' between state unjust enrichment laws 'are not sufficiently substantive to predominate over the shared claims.'"  *Id*. (quoting *Hanlon*, 150 F.3d at 1022).  In light of this "common thread," courts abound have certified multistate and nationwide classes for unjust enrichment.  *See e.g. In re Flonase Antitrust Litig.* 284 F.R.D. 207 (E.D. Pa. 2012) (proof of liability on unjust enrichment claims under numerous state laws could be determined on class-wide basis – with regard to proving liability, the evidence would be the same for each class member); *O'Brien v. Brain Research Labs, Inc*., 2012 WL 3242365 at *6 (D.N.J. Aug. 8, 2012) ("(1) the laws of the fifty states are relatively uniform with respect to the elements of proof of an unjust enrichment claim; and (2) those elements of proof require little, if

any, individualized inquiry."); *Dal Ponte v. American Mortg. Exp. Corp.*, 2006 WL 2403982, *8 (D.N.J. 2006) (certifying nationwide class for New Jersey Consumer Protection Act and unjust enrichment claims).  These courts concluded the minor differences bearing on unjust enrichment did not defeat predominance.

Nor does Plaintiffs' claim for breach of constructive trust materially differ across state jurisdictions.  (*See* Appendix D).  Justice Cardozo wrote famously, "[a] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 286 (1918).  Courts today apply this equitable doctrine with some flexibility. In general, "to establish a constructive trust there must be provided: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *Petrello v. White*, 412 F. Supp. 2d 215, 232 (E.D.N.Y. 2006), *aff'd*, 344 Fed. Appx. 651 (2d Cir. 2009) (unpublished).  "That being said, 'strict adherence to the confidential or fiduciary relationship element of a constructive trust is not necessary when a party holds property under circumstances that in equity and good conscience he ought not retain.'" *Id.* (*quoting Sec. Pacific Mortg. & Real Estate Services, Inc. v. Republic of Philippines*, 962 F.2d 204, 210 (2d Cir.1992)).  As a result, courts may find a breach even where no fiduciary relationship exists. *Koreag, Controle Et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag, Controle Et Revision S.A.)*, 961 F.2d 341, 354 (2d Cir.1992) (holding that the lack of a fiduciary relationship between the parties does not automatically defeat the claimant's claim for a constructive trust).  Like Plaintiffs' claim for unjust enrichment, their claim for breach of constructive trust does not defeat predominance. *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, *24-25 (N.D. Cal. June 13, 2014)

(the difference in state contract laws are immaterial – "variations in state contract law do not defeat predominance").

Plaintiffs will prove their unjust enrichment and breach of constructive trust claims with common evidence.  First, Plaintiffs will demonstrate they and the class members conferred a benefit on LuLaRoe which was unjust—paying surcharges disguised as tax they did not owe.  This evidence will include LuLaRoe's 2016 Tax Policy and subsequent changes to it, its contracts with ControlPad and the management of Audrey, the testimony of LuLaRoe's CEO, Mark Stidham, and others.  It will also include evidence that LuLaRoe specifically recognized it was collecting additional monies from Plaintiffs and the class members in the guise of taxes that did not exist.  Thus, Plaintiffs can show with common evidence that LuLaRoe appreciated that benefit.  Second, Plaintiffs will show that LuLaRoe's retention of that benefit is unjust.  That evidence will include evidence that LuLaRoe knowingly devised and maintained the scheme at the expense of the class members, that LuLaRoe recognized its charges were not in their best interests, and evidence that, despite all of this, LuLaRoe reaped significant benefits from its conduct.  (*See* Section (II)(I), above).  Because this common evidence spans every class, Plaintiffs seek to certify their claims for unjust enrichment and for breach of constructive trust under the laws of Alaska, Delaware, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, and Vermont.

### e.   Damages can be determined on a class-wide basis

Plaintiffs must show that common issues predominate with respect to their ability to prove measurable damages.  *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. at 188.  However, the fact that there are variations in the remedies available to an injured class under various states' laws does not defeat predominance.  *Sullivan*, 667 F.3d at 301.  Predominance is

not lost merely because "certain class members may be eligible for treble damages or punitive damages" under their respective states' laws, while other class member may be limited to actual damages – material variations in state law remedies can be accounted for in the calculation of damages. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 530 (3d Cir. 2004); *see also Mullins*, No. 13 CV 1829, 2014 WL 5461903 at *3 (predominance is satisfied when "Plaintiff's theory of damages – a full refund and statutory consumer fraud fines – matches his theory of liability").

Here, damages can be calculated based on common methodology. LuLaRoe has already identified each transaction, and the corresponding consumer (*i.e.*, class member) for each transaction, in which it unlawfully charged a "tax." LuLaRoe's actions caused surcharges on more than 2.5 million transactions totaling over $8.3 million. Plaintiffs, for themselves and the class members, seek (1) a refund of all "taxes" unlawfully collected; (2) an accounting of those "taxes" unlawfully collected; and (3) any statutory, exemplary, and punitive damages allowed by law. Like in *In re Warfarin Sodium Antitrust Litig.*, the differences in state laws with respect to statutory damages and/or punitive damages can be easily accounted for in the calculation of damages. Indeed, the damage calculation, here, amounts to simple mathematics   Predominance is satisfied because the claims of the Plaintiffs and putative class arise from the same unlawful practice and policy. LuLaRoe uniformly overcharged all persons who reside in the class jurisdictions that should not have been assessed use tax on the products they purchased from LuLaRoe. If Plaintiffs can prove this uniform practice is illegal under the claims asserted, and discussed above, they and each class member are entitled to recovery. Because liability and damages can be proven on a class-wide basis, predominance is satisfied in this case.

2. **Superiority**

Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[I]t provides a non-exhaustive list of factors to consider in determining superiority, including: the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action." *CBNV III*, 795 F.3d at 408-09 (citing Fed. R. Civ. P. 23(b)(3)). "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Id.* at 409. The Federal Rules of Civil Procedure directs courts to weigh the following factors to determine whether a class action is superior to other alternative methods of adjudication: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23 (b)(3)(A)-(D). In light of these factors, this Court should find that class action treatment is more appropriate in this case.

Here, the above-stated factors strongly support class certification. First, the Class members do not have a palpable interest in individually controlling the prosecution of separate actions, given the small value of possible recovery, these class members would lack the incentive to bring individual suits against Defendant. *See Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D. Pa. 1994) ("Given the relatively small amount recoverable by each potential litigant, it

is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action.").

Plaintiffs' counsel are not aware of any other pending litigation concerning the controversy at issue. In addition, a class action lawsuit is desirable in this case because it would promote judicial economy in that the court could address the claims of all class members for the eleven effected states with consistency, in one action. Last, no apparent difficulties are evident in managing this lawsuit as a class action, as is discussed more fully below. In fact, as described above, other courts have granted class certification for similar claims in the past. In terms of fairness and efficiency, a class action lawsuit is unquestionably the superior vehicle for litigating this case.

### 3. **Manageability**

It is well settled that manageability is rarely an adequate basis to deny class certification. *See, e.g.*, *In re Plastics Additives Antitrust Litig.*, No. 03-cv-2038, 2006 WL 6172035, at *13 (E.D. Pa. Aug. 31, 2006) ("[D]enying certification on the sole ground of the unmanageability of the action, at least at the class certification stage, is 'disfavored.'"); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'").

As the Third Circuit recently recognized, "Rule 23(d) vests in the [District] Court substantial discretion to enter orders, subsequent to the Order Certifying the Class … to manage the class," and "there are imaginative solutions to problems created by the presence in a class action litigation of individual damages." *CBNV III*, 795 F.3d at 410; *see also Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (detailing myriad ways to manage class

actions); *Zeno v. Ford Motor Co., Inc.*, 238 F.R.D. 173, 196 (W.D. Pa. 2006) (similar); *Meyer v. CUNA Mut. Group*, CIV.A. 03-602, 2006 WL 197122, at *22 (W.D. Pa. Jan. 25, 2006) (similar); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 156-7 (N.D. Ill. 2017) (finding that differences among four states' consumer protection laws in manageable although allowable recoveries differ across the states).

Plaintiffs have submitted a Proposed Trial Plan with their Motion for Class Certification. A class action is both manageable and manifestly superior to the litigation of the claims at issue in individual civil actions. Managing the individual claims of Plaintiffs and the putative members of the classes in a single action will further judicial economy and efficiency, and lead to the just and timely resolution of the claims of a myriad of similarly situated individuals.

### C.  Rule 23(g) Appointment of Class Counsel is Warranted

"A court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). In appointing class counsel, the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1).

Plaintiffs propose R. Bruce Carlson and Kevin W. Tucker of Carlson Lynch Sweet Kilpela & Carpenter, LLP and Kelly K. Iverson of Cohen & Grigsby, P.C. as Co-Lead Class Counsel. Each of these attorneys has diligently investigated and pursued the claims in this litigation. Collectively, counsel has extensive experience managing and litigating complex cases and class/collective actions such as this one. Counsel are well-versed in the applicable law. Finally, counsel's willingness to expend resources in the cause of this case is amply

demonstrated by counsels' involvement in the discovery to date, which included ten depositions of named Plaintiffs, which occurred in four different states and depositions of representatives of Defendant, which occurred in California and Idaho; the production of nearly 3,000 pages of documents from Plaintiffs; and management of LuLaRoe's consistent effort to avoid its discovery obligations.  Accordingly, Rule 23(g) is satisfied.

## V.    CONCLUSION

For the above stated reasons, Plaintiffs respectfully request that this honorable Court certify the following classes under Fed. R. Civ. P. 23, for the specified claims, and designate the respective class representative to represent the class:

| State | Class Description | Claims to be Certified | Class Representative |
|-------|-------------------|------------------------|----------------------|
| **Pennsylvania** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Pennsylvania | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Rachael Webster |
| **New York** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into New York | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Lauren Porsch |
| **Minnesota** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Minnesota | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Holly Lederer |
| **New Hampshire** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into New York | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Sara Gates |
| **Delaware** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Delaware | Consumer Protection; Unjust Enrichment; Constructive Trust | Donna Newman |
| **Alaska** | All persons who were assessed tax on clothing purchases processed through | Consumer Protection; | Katie Van |

| | | | |
|---|---|---|---|
| | Audrey, and whose purchases were delivered into Alaska | Conversion; Unjust Enrichment; Constructive Trust | |
| **Oregon** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Oregon | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Maureen McGuinness |
| **Montana** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Montana | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Melissa Hill |
| **New Jersey** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into New Jersey | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Lorraine Snodgrass |
| **Massachusetts** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Massachusetts | Conversion; Unjust Enrichment; Constructive Trust | Alison Whitehead |
| **Vermont** | All persons who were assessed tax on clothing purchases processed through Audrey, and whose purchases were delivered into Vermont | Consumer Protection; Conversion; Unjust Enrichment; Constructive Trust | Amanda Close |

Dated: December 6, 2017                    Respectfully Submitted,

By:   */s/ R. Bruce Carlson*
      R. Bruce Carlson, Esq.
      bcarlson@carlsonlynch.com
      Pa. ID No. 56657
      Gary F. Lynch, Esq.
      glynch@carlsonlynch.com
      Pa. ID No. 56887
      Kevin Abramowicz
      kabramowicz@carlsonlynch.com
      Pa. ID No. 320659
      Kevin W. Tucker, Esq.
      Pa. ID No. 312144
      ktucker@carlsonlynch.com

      **CARLSON LYNCH SWEET KILPELA
      & CARPENTER, LLP**
      1133 Penn Avenue, 5th Floor
      Pittsburgh, PA 15222
      (p) (412) 322-9243
      (f) (412) 231-0246


By:   */s/ Kelly K. Iverson*
      Kelly K. Iverson
      kiverson@cohenlaw.com
      Pa. ID No. 307175
      Alex Lacey
      alacey@cohenlaw.com
      Pa. ID No. 313538

      **COHEN & GRIGSBY, P.C.**
      625 Liberty Avenue
      Pittsburgh, PA 15222
      (p) (412) 297-4838

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will serve all counsel of record via a notification of electronic filing (NEF) on this December 6, 2017.

<u>*/s/ R. Bruce Carlson*</u>
R. Bruce Carlson